# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 07-03057-01-CR-S-DW |
| GARLIN RAY BANEY, ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress, to which the government has responded.

The matter was set for an evidentiary hearing, which was held before the undersigned on January 29, 2008. Defendant was represented by counsel, Dee Wampler, and the government was represented by Assistant United States Attorney Tim Garrison.

It is defendant's contention that he did not consent to the search of his residence. He claims that the entry onto his property was trespass, that the entry into his house was without a warrant or his consent, and that it was therefore an illegal search and seizure. He seeks the suppression of any evidence or statements made on the basis of the illegal search.

The government asserts that defendant was the owner and possessor of the residence, and that he gave voluntary consent to search the residence. It is contended that defendant's arrest was lawful, pursuant to an arrest warrant, and that a search incident to the lawful arrest of defendant and

1

his immediate proximity was also lawful. Further, it is asserted that the limited protective sweep was lawful. The government states that there were other persons in the home, including the co-defendant, who was furtively attempting to conceal drugs and drug paraphernalia, which were in plain view during the sweep. Accordingly, the government contends that the motion to suppress should be denied.

The government called Officer Fred Stenger with the South Central Drug Task Force. On May 30, 2007, he participated in the arrest of defendant at his residence. He knew it was defendant's residence because of prior visits to the home. Four or five other officers were with him. They had a warrant for defendant's arrest. As they were approaching the front of the house, they heard defendant ask something like, "What are you boys doing creeping around out there?" [Tr. 3]. The officers went on the front porch, where the door was open, and told him they were there to arrest him. Defendant didn't have much to say, but just came out the door. Officer Stenger was in plain clothes, as were several of the other officers, and several were in uniform. Some of the officers arrived in marked patrol cars, and others were in unmarked vehicles. The uniformed officers were there for everyone's protection. They were concerned with their safety because they had had reports over the years of people who spent a lot of time at that residence. Several weeks before a woman had left an anonymous report that she was near the residence and someone came out of the house in camouflage, with an AK-47 and ran her off. They had reason to believe that there were firearms in the house, and had been told through interviews with other people that defendant had exchanged drugs for firearms for several years. As they got closer to the house that day, they had heard footsteps and could see bodies moving. Officer Campbell asked if there were other persons in the house. Defendant said there were. Officers Campbell and Reeder conducted a

2

protective sweep of the house, which took about five minutes. They found two individuals in the house, and brought them to the living room to secure them. To Officer's Stenger knowledge, they did not conduct any further search. Pursuant to defendant's arrest, they searched his person and the immediate vicinity where he had been. They recovered a large sum of money on his person. Narcotics and a firearm and some ammunition were also recovered inside. The firearm was recovered from where defendant had immediately been prior to the officers contact with him. Officer Stenger testified that it was located inside the front door, within arm's reach of where defendant had been sitting. Officer Stenger advised defendant of his Miranda rights, utilizing a card, which he had obtained from Trooper Nelson of the Highway Patrol. Defendant indicated that he understood his rights. Additionally, he was calm and cooperative. The officer did not interrogate him. They did explain that they had the arrest warrant, and told him they would have to take him to Springfield after his arrest. The officer did not believe anything was ever brought up about the alleged crimes for which he was arrested.

Officer Stenger testified that he requested consent to search the house. After the other officers had gone inside, he asked defendant if there were any other narcotics in the house. Defendant said that there weren't. The officer asked defendant if he minded if they searched, and defendant said something to the effect of, "no, go ahead do whatever you want to do." [Tr. 8]. The officer had been trained to use the word "search," to avoid confusion, so he was sure that is what he asked. Defendant was not hesitant or reluctant. No threats or promises were made. The officer has been trained to identify persons who are under the influence of alcohol, and defendant exhibited none of those symptoms. He was in mental control, did not smell like alcohol, and did not have glassy or bloodshot eyes. Defendant did not limit the search, complain about it, or revoke his

3

consent. He believed that Officer Campbell searched one of the out buildings. He thought they all had to be unlocked. It was his belief that Ramona Davis got the keys and unlocked them. Officer Stenger testified that he had searched the house before, with defendant's consent.

On cross examination, the officer agreed that defendant had some health problems and is in a wheelchair. He agreed that in the months preceding this search, an informant had been inside the house, and had purchased narcotics from defendant. He is not aware that defendant had ever threatened law enforcement or had any arrests or convictions for assaulting a law enforcement officer

. He had no reason to believe that defendant possessed the AK-47. Officer Stenger repeated that four or five other officers were present. He did not obtain written consent to search, although he did have a form to do so. Regarding the Miranda warnings, the officer did not receive a written waiver, although he did have the form for that also.

When he approached the house, he told defendant to come out, that he needed to talk to him, and defendant came out. Had he not come out, the officer agreed that they would have gone in and gotten him. He agreed that defendant had always been placid and peaceful in the past. He was not aggressive when he came out on the porch. The other persons inside were females. Regarding how long the officers were in the house during the protective sweep, Officer Stenger testified that it might not have been five minutes, and that was just his best guess. It was probably anywhere from two to five minutes. He stated that it was a small house, and the officers looked only in the two bedrooms, bathroom, closets, and places that a person might be hidden. The women who were found in the house were brought back to the living room and stayed there. One was eventually taken into custody. The women were not armed or dangerous.

4

At the time that defendant said something like "Go ahead and do whatever you want to do," [Tr. 20], the other officers were already inside the house. The officer denied that the protective sweep was finished at that time. He denied that the officers were searching during the protective sweep, but agreed that they could have seen things that were in plain view during that time. He also agreed that some of the items that were recorded as being removed were in plain view. Officer Stenger testified that, as soon as the officers went inside, he asked defendant for his consent. It couldn't have been more than 30 seconds. There was also a young female in the house; he doesn't know her name. She wasn't listed in his report because there was no connection between her and the investigation. A search warrant was never sought, because they did not feel that they needed one, due to defendant's cooperation in the past. This was probably the third or fourth consent search that defendant had allowed of his residence. Defendant did not claim ownership of any of the items, and the officer did not think they asked him anything, except about the weapon. He did say that the gun which he thought was loaded at the time, belonged to his grandson.

On redirect examination, the witness testified that it was possible that the protective sweep could have been less than five minutes. He relayed to the officers inside, once they had secured the other individuals and brought them to the living room, that they had consent to search. Several other known narcotics dealers had been in the residence previously, and then they had the report from the woman who said she was run off by someone with an AK-47 on that property.

On recross examination, the officer stated that he did not know anything current about known narcotics dealers being at defendant's residence, nor about armed and dangerous individuals being there, with the exception of the AK-47 incident. ,He denied that the protective sweep was a pretext for getting inside the house.

5

The government next called Highway Patrol Sergeant Dewayne Gale. He had been at defendant's residence before, and participated in this arrest. Defendant came outside on the porch, in a casual fashion. He cooperated with the officers, and was not handcuffed when he was arrested. Other officers conducted a protective sweep, and he believed they found some other persons inside. He observed Officer Stenger read defendant his Miranda rights, and observed a search of his person and immediate area. He heard Officer Stenger ask for consent to search, and heard defendant say something like, "search wherever you want or whatever you want." [Tr. 33]. He did not appear to be under the influence of drugs or alcohol. Sergeant Gale testified that defendant never complained about the search, nor did he try to stop it.

On cross examination, Sergeant Gale stated that he saw movement inside the house, and then defendant came outside when he was instructed to. He did not enter the residence for the protective sweep. He didn't have any personal knowledge about dangerous persons inside the house. He thinks the protective sweep took about thirty seconds, but that's just a guess. Perhaps it took longer. Because the women were kept inside, the officers stayed with them, so it might have been longer.

On redirect, the officer testified that Officer Stenger told defendant about the arrest warrant and then immediately asked for consent to search the residence. Therefore, it was not long after the officers entered the residence that defendant granted consent. He was in defendant's presence the entire time, and he never revoked his consent.

Officer Brent Campbell of the Southwest Missouri Drug Task Force testified that he also participated in the arrest of defendant. The officers approached the residence, and Officer Campbell asked defendant if there was anyone else in the house. Defendant said that there was. Officer Campbell went inside with Officer Reeder, and conducted a protective sweep. Officer Reeder went

Case 6:07-cr-03057-DW   Document 64   Filed 02/15/08   Page 6 of 10

to the right and began to sweep the residence, and he went to the left. He found Brittany Ross in the back bedroom and Ramona Davis in the bathroom. He estimated that the sweep took minutes, as it was a small residence. Ms. Ross appeared to be trying to hide something in the bedroom, but he didn't attempt to see what she was hiding. He took both women to the front room. He asked Ms. Ross to empty her pockets because she stated that she had a knife in her pocket. He stayed with all three female subjects, whom they had located in the house. They didn't search anywhere that was too small to hold a person, such as drawers or cabinets. He later learned that defendant had granted consent to search. Officer Campbell was standing in the living room, and Officer Stenger stuck his head inside and told them that defendant had granted consent to search. Office Stenger said "to go ahead and commence a consent search investigation." [Tr. 43]. He did search the house at that time, starting with where Ms. Ross appeared to have been hiding something. He also conducted a search of out buildings on the property after defendant stated that he would give consent to search there also. They all had to be unlocked, but he doesn't remember where the keys came from. Ms. Davis escorted him to all the out buildings with the keys and she unlocked the buildings. Officer Campbell testified that defendant pointed out the key on a large key ring that would actually unlock the locks. He showed no reluctance to do this, was very jovial, just sitting and smoking, and never revoked his consent.

On cross examination, Officer Campbell stated that he was in the house when consent was granted. He acknowledged that his report stated, "At the time of his arrest, consent to search his residence was obtained." [Tr. 45]. He explained that it took no time for the sweep. He agreed that it probably took minutes to collect the women and get them to the front room. Additionally, his report also said that it was a short time later that they were informed about the consent. At the time

7

he was conducting the protective sweep, he was concerned with contraband, but rather, with people in the house. As he was in the living room, the only thing he noticed was a firearm.

Defendant called Ramona Davis to the witness stand. She was at defendant's residence on May 30, 2007. Defendant is her uncle. She'd been there about an hour. Ms. Davis was in the restroom when the officers entered the residence. An officer knocked on the bathroom door, and she asked him what was going on. He told her that she needed to go to the couch. It took about a minute or two to finish drying off her hands, etc. Defendant was on the front porch. She did not hear the officers talking to defendant, nor did she hear him say anything. She had heard the officers yell that they wanted to arrest defendant. She thought it was at least 20 minutes until they searched the residence. The officers wanted to look in the out buildings, and she took them to those buildings. She asked for a list for what they'd taken from the residence, but never received an inventory.

On cross examination, Ms. Davis testified that from the time she was brought into the living room until the search began was about 20 minutes, during which time the officers checked their identification. When she took the keys and went to the out buildings, she never saw defendant protest or argue about the search.

In this case, there is no issue regarding the fact that the officers had a valid arrest warrant, which they legally executed at defendant's residence on the day in question. The law is clear, moreover, that officers have the authority to conduct a protective sweep of a residence if they reasonably believe, based on specific and articulable facts, that the residence harbors an individual who could be dangerous. Maryland v. Buie, 494 U.S. 325, 334 (1990); United States v. Walsh, 299 F.3d 729, 733 (8th Cir. 2002). A protective sweep is limited to a cursory inspection of spaces where a person may be found and may not last longer than is necessary to dispel the reasonable suspicion

of danger. Buie, 494 U.S. at 335. Additionally, evidence observed during a protective sweep that is in plain view and immediately recognizable as incriminatory, such as firearms or drug paraphernalia, may be seized if the officer is legally present. United States v. Khabeer, 410 F.3d 477, 482 (8th Cir. 2005).

All the credible evidence indicates that defendant granted voluntary consent to search his residence. The officers testified that he was cooperative, as he had repeatedly been in the past, that he was not under the influence of alcohol or otherwise suffering from impaired judgment, and that he told them to go ahead and search when they requested to do so. There is not a scintilla of evidence to suggest that defendant felt threatened, and no indication that he ever tried to curtail the search. Even Ms. Davis testified that when she accompanied the officers to the out buildings with the key, defendant did not try to stop the search of those buildings. Despite his attempt to suggest that the protective sweep was too broad and therefore unlawful, the credible testimony indicates that the sweep extended only far enough to apprehend the other individuals inside the residence. Clearly, the officers had reasonable concern about who might be in the house, given the fact that there had been a report of an incident with an AK-47 within the last few weeks, a history of defendant's involvement with law enforcement, and the fact that they knew there were people inside the residence, but did not know who or how many. Further, the officers agreed that consent was sought as soon as defendant was placed under arrest. Although the officers conducting the sweep were already in the house, there was nothing in the testimony that would suggest that they were actually searching, as opposed to securing, the house before they learned that defendant had consented to the search. The evidence establishes that the sweep was only a cursory inspection and lasted no longer than necessary, and that the firearm that was observed was in plain view. Accordingly, the

Court finds that the credible evidence adduced at the hearing confirms that the protective sweep was within lawful parameters, and that the actual search of the residence was a consensual one. Therefore, it will be recommended that the motion to suppress be denied.

Having fully reviewed the testimony at the hearing, the arguments of the parties, and the relevant case law, the Court finds that it must be recommended that defendant's Motion to Suppress be denied.

For the foregoing reasons, it will be

RECOMMENDED that defendant's Motion to Suppress be denied.

/s/ James C. England<br>JAMES C. ENGLAND, CHIEF<br>UNITED STATES MAGISTRATE JUDGE

DATE:   2/15/08